UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NOEL BUTCHER                                    CIVIL ACTION

VERSUS                                          NO: 07-8136

SUPERIOR OFFSHORE                               SECTION: R(4)
INTERNATIONAL, LLC

**ORDER AND REASONS**

Before the Court is third-party defendant Marlin Energy
LLC's motion for summary judgment that Triumph Energy LLC is not
entitled to indemnification or to be named as an additional
insured for first-party plaintiff Noel Butcher's alleged
injuries.[1]  Because Triumph has failed to create a genuine issue
of material fact as to whether Butcher's employer, Superior
Offshore International, LLC, was a "representative" of Marlin's,
or as to whether Butcher was Marlin's "borrowed employee,"
Marlin's motion is GRANTED.

---

[1]    (R. Doc. 127; R. Doc. 133.)

I.   **BACKGROUND**

On June 7, 2004, Marlin entered into a Master Time Charter Agreement (MCA) with Gulf Offshore Logistics, LLC under which Marlin would, from time to time, charter vessels from Gulf Offshore.[2]  Under the MCA, Gulf Offshore is defined as "Owner" and Marlin is defined as "Charterer."[3]  With regard to Marlin's indemnification of Gulf Offshore, the MCA provides:

> NEITHER OWNER . . . THE VESSEL, HER OWNERS, OPERATORS, MASTER, AND CREW . . . SHALL HAVE ANY RESPONSIBILITY OR LIABILITY . . . FOR ANY INJURY . . . OF ANY EMPLOYEES OF CHARTERER, ~~ITS SUBCONTRACTORS,~~ OR ~~THEIR EMPLOYEES OR AGENTS~~ ITS REPRESENTATIVES, AND CHARTERER SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS OWNER, . . . THE VESSEL, [and] ITS OWNERS . . . FROM AND AGAINST ANY SUCH CLAIM . . . WHETHER CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULTS OF INDEMNITIES, OR BY UNSEAWORTHINESS OF THE VESSEL OR EQUIPMENT OF OWNER, OWNER'S PROPERTY OR OWNER'S SUBCONTRACTORS' PROPERTY. . . .[4]

The MCA also includes a provision requiring Marlin to

---

[2]   (R. Doc. 127-2.)

[3]   (*Id.* at 3.)

[4]   (*Id.* at 7.)  In its opposition to summary judgment, Triumph questions the authenticity of the above-quoted MCA, submitted by Marlin.  (R. Doc. 133 at 5-6.)  Triumph, however, has not submitted a competing version of the MCA, and Marlin has provided two affidavits, one from Eugene Minvielle, Marlin's Chief Financial Officer and Treasurer, and one from Randy E. Wheeler, Marlin's former Vice President, attesting that the MCA in the record was in place during the relevant time period.  (R. Doc. 127-2; 153-1.)  Accordingly, in the absence of evidence to the contrary, the Court finds that the MCA in the record governs the relationship between Marlin and Gulf Offshore for the purposes of Marlin's motion for summary judgment.

maintain various forms of insurance.[5]  For the policies on "All Risks Cargo" and "Equipment Insurance and "Contractual Liability Insurance," Marlin was required to name "Owner, the vessel, its owners, master, and crew, and their respective underwriters as Additional Assureds and shall Waive Subrogation against such Additional Assureds, but such naming and waiving shall only apply with respect to the Indemnities, obligations, and risks assumed by Charterer in this Agreement."[6]

In connection with sandblasting work to be performed on one of Marlin's oil platforms, Marlin chartered a vessel, the L/B MAGGIE, from Gulf Offshore Logistics pursuant to the MCA.[7] Though the MCA describes Gulf Offshore as the "Owner," the L/B MAGGIE is, in fact, owned by Triumph Marine, Inc.[8]

On September 14, 2004, Marlin entered into a Master Service Agreement (MSA) with CW Technical Services to govern future work or services that CW would perform, from time to time, to be requested by Marlin.[9]  On October 21, 2004, Marlin entered into an identical MSA with Superior.[10]

---

[5]     (*Id.* at 6-7.)

[6]     (*Id.* at 6.)

[7]     (R. Doc. 127-2.)

[8]     (R. Doc. 127-7.)

[9]     (R. Doc. 153-3.)

[10]    (R. Doc. 127-4.)

Butcher, the first party plaintiff in this case, was hired by Superior to perform work aboard the L/B MAGGIE.[11]  On June 25, 2005, Butcher was allegedly injured when a crane line on the L/B MAGGIE snagged and "jerked" him forward.[12]  Although Triumph initially alleged that, at the time of the incident, Superior was working directly as a contractor for Marlin,[13] during discovery, the parties learned that Marlin had, in fact, hired CW for the work performed on June 25, 2005, and that CW hired Superior.[14]

Butcher sued Superior for damages on November 7, 2007.[15] Superior filed a third-party complaint for indemnification against Triumph,[16] and Triumph in turn filed a third-party complaint for indemnification against Marlin.[17]  Marlin has moved for summary judgment that Triumph is not entitled to indemnification or to be named as an additional insured under the terms of the MCA.[18]  The Court denied Triumph's Rule 56(f) motion

---

[11]   (R. Doc. 24-5 at 30-34.)

[12]   (R. Doc. 1; R. Doc. 31-2 at 79.)

[13]   (R. Doc. 127-7.)

[14]   (R. Doc. 143-3 at 3; 153 at 5-6; R. Doc. 164-1; R. Doc. 179.)

[15]   (R. Doc. 1.)

[16]   (R. Doc. 127-6.)

[17]   (R. Doc. 127-7.)

[18]   (R. Doc. 127-1.)

for a continuance to pursue further discovery on September 30, 2010.[19]  The Court now GRANTS Marlin's motion for summary judgment.


## II.  LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2738 (1983)).

---

[19]    (R. Doc. 185.)

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *Id.* at 325; *see also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discover and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to

6

that party's case, and on which that party will bear the burden of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).

**III. DISCUSSION**

**A.   Indemnification As A "Representative"**

Triumph's contends that it is entitled to indemnification for Butcher's claims because Superior – Butcher's employer – was a Marlin "representative" under the indemnification provision of the MCA executed between Marlin and Gulf Offshore.[20]   In relevant part, the MCA provides:

> NEITHER OWNER, [*i.e.*, Gulf Offshore] . . . THE VESSEL [*i.e.*, the L/B MAGGIE], HER OWNERS [*i.e.*, Triumph], OPERATORS, MASTER, AND CREW . . . SHALL HAVE ANY RESPONSIBILITY OR LIABILITY . . . FOR ANY INJURY . . . OF EMPLOYEES OF CHARTERER [*i.e.*, Marlin], ~~ITS SUB CONTRACTORS~~, OR ~~THEIR EMPLOYEES OR AGENTS~~, <u>ITS REPRESENTATIVES</u>, AND CHARTERER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS OWNER, . . . THE VESSEL, [and] ITS OWNERS . . . FROM AND AGAINST ANY SUCH CLAIM . . . WHETHER CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULTS OF INDEMNITEES, OR BY UNSEAWORTHINESS OF THE VESSEL OR EQUIPMENT OF OWNER, OWNER'S PROPERTY OR OWNERS SUBCONTRACTORS' PROPERTY. . . .

For its part, Marlin argues that Superior was a "subcontractor," as opposed to a "representative," and that Marlin is not required to provide indemnification for Marlin's subcontractors, as evidenced by the strikethrough of the words "ITS SUB CONTRACTORS" in the MCA.[21]

---

[20]   (R. Doc. 127-7 at 3; R. Doc. 133 at 6-9.)

[21]   (R. Doc. 127-1 at 5-7.)

The interpretation of a contractual indemnity provision is a question of law. *Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009). "A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Id.* An indemnity provision is interpreted to cover the losses or liability reasonably contemplated by the parties, *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981), but it "will not afford protection unless its terms are expressed unequivocally." *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 834 (5th Cir. 1992).

Triumph's argument that Superior was a "representative" is based in part on its initial understanding that Marlin contracted directly with Superior for the sandblasting work during the relevant time period.[22] In its opposition to summary judgment, Triumph claims that, because Marlin was not a "contractor," but instead the owner of the platform on which Superior performed the sandblasting work, Superior cannot be a "subcontractor," because "[t]here is no 'Original Contract' that is over the Marlin/Superior contract."[23] Marlin, however, has submitted evidence, consisting of billing invoices, that it contracted with CW for the work performed at the time of Butcher's alleged injury

---

[22]   (R. Doc. 133 at 6.)

[23]   (*Id.* at 6-7.)

8

and that CW, in turn, hired Superior.[24]  In addition, Marlin's
corporate representative, Lawrence Frey Svendson, testified that
Marlin was "working with C.W. Technical Services at the time."[25]
Triumph has submitted no evidence to the contrary and, in
relation to another motion for summary judgment before the Court,
conceded that Superior "may not have been working for Marlin at
the time of the incident."[26]  In light of the evidence submitted
by Marlin and Svendson's testimony, the Court finds that Superior
was a Marlin "subcontractor" at the time of Butcher's alleged
injury.  *See Hardu*, 949 F.2d at 834 ("A maritime contract
containing an indemnity agreement, whether governed by federal
maritime or Louisiana law, should be read as a whole and its
words given their plain meaning unless the provision is
ambiguous."); *see also Black's Law Dictionary* (9th ed. 2009)
(defining "subcontractor as "[o]ne who is awarded a portion of an
existing contract by a contractor, esp. a general contractor").

The MCA provides indemnification only for injuries sustained
by employees of Marlin and its representatives.  Although an
earlier draft of the MCA seems to have contemplated
indemnification for the injuries of subcontractors' employees,
the version of the MCA in the record indicates that Marlin is not

---

[24]     (R. Doc. 153-2.)

[25]     (R. Doc. 143-3 at 11.)

[26]     (R. Doc. 164-1 at 2.)

obligated to provide such indemnification because the parties struck through the words "ITS SUB CONTRACTORS."[27]  Further, by referring to both "representatives" and "subcontractors" in the indemnification section, the MCA suggests that, as a subcontractor, Superior was not a representative.  *See Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004) ("A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all of the terms in the contract without rendering any of them meaningless or superfluous.").  Because Superior was a subcontractor, the MCA contemplates indemnification only for Marlin's representatives, and the terms "representative" and "subcontractor" appear to have different meanings, the Court finds that the MCA does not unequivocally provide for Marlin to indemnify Triumph for injuries to Superior's employees.

The Court's conclusion is supported by the meaning of the term "representative."  Although the MCA does not define that term, both parties rely on *Black's Law Dictionary* to define "representative" under the MCA.[28]  *Black's* defines "representative" as "[o]ne who stands for or acts on behalf of another . . . *See* AGENT."  *Black's Law Dictionary* (9th ed. 2009).  In turn, *Black's* defines "agent" as "[o]ne who is authorized to

---

[27]     (R. Doc. 127-2 at 7.)

[28]     (R. Doc. 133 at 7; R. Doc. 127-1 at 7.)

act for or in place of another; a representative." *Id.* Because the term "representative" is a synonym of the term "agent," and because the parties have pointed to no other common understanding of the term, the Court looks to general agency law to determine whether Superior could be a Marlin "representative" in addition to a "subcontractor."

Agency is never presumed and must be proven affirmatively. *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1296 (5th Cir. 1994) ("The party asserting an agency relationship bears the burden of proof."). To prove an agency relationship, a plaintiff must show that: (1) the principal indicated the agent was acting for it, (2) the agent acted or agreed to act on the principal's behalf, and (3) the agent was subject to the principal's control. *Aetna Ins. Co. v. Glenn Falls Ins.* Co., 453 F.2d 687, 690-91 (5th Cir. 1972); *Steel Coils, Inc. v. Captain Nicholas I M/V*, 197 F. Supp. 2d 560, 567 (E.D. La. 2002); *see also* Restatement (Second) of Agency § 1 cmt. a (1958) ("The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act."). "[T]he essential element of an agency relationship is the right of control." *In re Caroline Paxson Adver., Inc.*, 938 F.2d 595, 598 (5th Cir. 1991). The principal must have the right to control both the "means and the details" of its agent's performance. *Id.* Further,

11

the Fifth Circuit has indicated that federal maritime law incorporates these principles. *See Cactus Pipe & Supply Co., Inc. v. M/V Montmatre*, 756 F.2d 1103, 1111 (5th Cir. 1985) ("Maritime law embraces the principles of agency.") (citing *West India Industries, Inc. v. Vance & Sons AMC-Jeep*, 671 F.2d 1384 (5th Cir. 1982); *see also MTO Maritime Transport Overseas, Inc. v. McLendon Forwarding Co.*, 837 F.2d 215, 218-19 (5th Cir. 1988) (finding an agency relationship based on the alleged agent's authority to enter into an agreement on behalf of the alleged principal in the context of a maritime breach of contract dispute).

There is no evidence that Marlin had the right to control the means and details of Superior's performance, and the MSA executed between Marlin and CW suggests otherwise.[29]  The MSA expressly provides that CW is "an independent contractor and that neither Contractor nor Contractor's principals, partners, employees, *or subcontractors*, are servants, agents or employees of MARLIN."[30]  The MSA also provides that "MARLIN shall not have

---

[29]   As noted above, Marlin entered into an MSA with Superior on October 21, 2004, which governs work requested by Marlin from Superior.  (R. Doc. 127-4 at 1; R. Doc. 143-3 at 3.) Because it appears that Marlin requested the relevant work from CW, the Court finds that the Marlin/Superior MSA is inapplicable. Even assuming its relevance, however, the Marlin/Superior MSA does not suggest that Marlin exercised control over Superior for similar reasons that the Marlin/CW MSA does not, because the two documents contain identical terms.

[30]   (R. Doc. 153-3 at 1-2) (emphasis added).

12

the right to control or direct the details of the work performed by Contractor."[31]  These provisions of the MSA are not dispositive, but they are persuasive expressions of the parties' intent.  *See e.g., Arguello v. Conoco, Inc.*, 207 F.3d 803, 807-08 (5th Cir. 2000) (finding no agency relationship when, *inter alia*, the terms of the contract expressly provided that branded stores were not agents of the alleged principal).

The MSA does give Marlin "the general right of inspection and supervision in order to secure the satisfactory completion of any work or services."[32]  But there is no evidence that Marlin controlled the means and details of Superior's work and services. To the contrary, Butcher testified during his deposition that a fellow Superior employee was responsible for supervising Superior's crew, and Butcher did not mention any interaction with Marlin employees during a typical work day.[33]  Similarly, although the MSA requires CW to institute a safety program acceptable to Marlin,[34] the record indicates that the means and details of the safety program were left to Superior.  Butcher testified during his deposition that Micah Manning, a Superior employee and supervisor, and not a Marlin employee, conducted

---

[31]     (*Id.*)

[32]     (R. Doc. 153-3 at 1-2.)

[33]     (R. Doc. 24-5 at 28; R. Doc. 31-2 at 161.)

[34]     (R. Doc. 153-3 at 6-7.)

daily safety meetings.[35]  Marlin's general right of inspection and supervision does not give rise to an agency relationship. *See, e.g.*, *Arguello*, 207 F.3d at 808 (holding that the right to impose standards of operation and to de-brand local stores was insufficient to establish agency relationship because the purported principal was not in control of the store's daily operations).

For all of these reasons, and because Triumph has pointed to no evidence that Marlin exercised control over the work performed by Superior, the Court finds that Triumph has failed to raise an issue of material fact that Superior was a representative of Marlin.

**B.   Indemnification As A "Borrowed Employee"**

Triumph alternatively contends that it is entitled to indemnity because Butcher was a "borrowed employee" of Marlin's, which would bring his claims within the scope of Marlin's indemnity obligations.[36]  The party asserting the existence of a borrowed employee relationship bears the burden of proof.  *Franks v. Assoc'd Air Center, Inc.*, 663 F.2d 583, 587 (5th Cir. 1981). Whether an individual is a borrowed employee is a "matter of law" determined by "nine separate factual inquiries":

---

[35]    (R. Doc. 24-5 at 45-46.)

[36]    (R. Doc. 133 at 9-11.)

14

1.   Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

2.   Whose work is being performed?

3.   Was there an agreement, understanding or meeting of the minds between the original and the borrowing employer?

4.   Did the employee acquiesce in the new work situation?

5.   Did the original employer terminate his relationship with the employee?

6.   Who furnished tools and place for performance?

7.   Was the new employment over a considerable length of time?

8.   Who had the right to discharge the employee?

9.   Who had the obligation to pay the employee?

*Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988) (citing *Ruiz v. Shell Oil Co.* 413 F.2d 310 (5th Cir. 1969)); *Brown v. Union Oil Co. Of Cal.*, 984 F.2d 674, 676 (5th Cir. 1993).  No single factor or set of factors is determinative in establishing a "borrowed employee" relationship.  *Brown*, 984 F.2d at 676.  The central factor is that of control.  *Id.; Melancon*, 834 F.2d at 1244-45 (same); *Ruiz*, 413 F.2d at 312 (same).

1.   <u>Control</u>

Under the first factor, the Court must ask whether Marlin exercised "authoritative direction and control" over Butcher beyond the mere suggestion of details or necessary cooperation.

15

*Ruiz*, 413 F.2d at 313.  As discussed above, there is no evidence that it did, and accordingly this factor weighs against borrowed employee status.


    2.   <u>Party For Whom The Work Is Performed</u>

    The second factor, the party for whom the work is performed, weighs in favor of a borrowed employee relationship.  In *Melancon v. Amoco Products, Co.*, 834 F.2d 1238 (5th Cir. 1988), the Fifth Circuit found that maintenance work on a platform was essential to the work of the platform's owner, even though such work was only incidental to production of hydrocarbons.  *Id.* at 1245.  The circumstances here are no different.  Butcher assisted with maintenance services on a platform owned only by Marlin, and his work was therefore performed for Marlin.[37]  This factor weighs in favor of borrowed employee status.


    3.   <u>Agreement Between The Original And Borrowing Employer</u>

    The third factor, whether there was an agreement between the original and borrowing employer, weighs against a borrowed employee relationship.  The MSA between Marlin and CW provides that CW is an independent contractor and that none of its "principals, partners, employees *or subcontractors*" are servants,

---

    [37]    (R. Doc. 24-5 at 30.)

16

agents, or employees of Marlin.[38]  The contract also provides
that Marlin has only a general right of inspection and cannot
control the details of the work performed by CW.[39]  Because the
MCA specifically expresses that CW's subcontractors, like
Superior, are not Marlin's agents, and Triumph points to no
evidence of any understanding that Butcher would be taking his
orders from Marlin, this factor weights against borrowed employee
status.

        4.   Acquiescence Of Employee

        The fourth factor, whether the employee acquiesced to his
new work situation, weighs in favor of a borrowed employee
relationship.  The question under this factor is whether the
employee was aware of his work conditions and chose to continue
working in them.  *Brown*, 984 F.2d at 678.  The Fifth Circuit has
not indicated the minimum amount of time necessary for an
employee to appreciate new work conditions.  *Compare id.* (holding
that one month was sufficient but recognizing that "many of our
cases affirming borrowed servant status have involved longer
periods of work"), *with Capps v. N.L. Baroid-NL Industries, Inc.*,
784 F.2d 615, 617 (5th Cir. 1986) (holding that one day was
sufficient where the plaintiff acquiesced to being sent

---

        [38]    (R. Doc. 153-3 at 1) (emphasis added).

        [39]    (*Id.* at 1-2.)

                                17

constantly into new work situations).  In this case, Butcher
worked on Marlin's platform for "three weeks and a few days"
before the accident.[40]  Further, Butcher testified that his "job
description" did not change when he moved from his previous
employer to Superior.[41]  On balance, the Court finds that Butcher
acquiesced to his new work situation aboard the L/B MAGGIE.


      5.   Termination Of Original Employment Relationship

      The fifth factor considers whether the original employer
terminated its relationship with the alleged borrowed employee.
The relationship need not be severed completely, as such a strict
standard would essentially eliminate the borrowed employee
doctrine.  *Melancon*, 834 F.2d at 1246.  Instead, the emphasis
"should focus on the lending employer's relationship with the
employee while the borrowing occurs."  *Id.* (quoting *Capps*, 784
F.2d at 618).  The relationship between the original employer and
the worker is not terminated when the original employer maintains
supervision over the alleged borrowed employee.  *Brown*, 984 F.2d
at 678.

      In this case, Butcher's testimony establishes that a
Superior employee continued to supervise Butcher's work on

---

[40]    (R. Doc. 24-5 at 26.)

[41]    (*Id.* at 27.)

Marlin's platform.[42]  In addition, a Superior employee conducted
daily safety meetings that Butcher was required to attend.[43]  The
evidence thus suggests that Superior did not terminate its
relationship with Butcher while Butcher was working on Marlin's
platform.  This factor weighs against borrowed employee status.

### 6.   Tools And Place Of Performance

The sixth factor inquires into which party provided the
tools and place of performance.  The record indicates that
Superior provided the sandblasting and painting equipment used to
complete the maintenance of Marlin's platform.[44]  But Marlin
chartered the L/B MAGGIE, where Butcher performed some work,[45]
was transported to and from the work site,[46] and ate and slept.[47]
Furthermore, most of Butcher's work was performed directly on
Marlin's platform.[48]  On balance, the Court finds that this
factor weighs in favor of borrowed employee status.  *Melancon*,
834 F.2d at 1246 (holding that district court did not err in

---

[42]   (*Id.* at 28; R. Doc. 31-2 at 161.)

[43]   (R. Doc. 24-5 at 45.)

[44]   (R. Doc. 31-2 at 37-39.)

[45]   (R. Doc. 31-2 at 163-164.)

[46]   (R. Doc. 24-5 at 34.)

[47]   (*Id.* at 50, 167.)

[48]   (R. Doc. 31-2 at 163-64.)

finding that the sixth factor weighed in favor of borrowed employee status when the alleged borrowing employer provided the place of performance, transportation to and from the work site, and food and lodging, and the original employer provided the welding machine and equipment needed for performance).

### 7. Duration of New Employment

The seventh factor, the length of time of the new employment, is neutral as to Butcher's borrowed employee status. Butcher worked on Marlin's platform for three weeks before sustaining his injury.[49]  The Fifth Circuit has found that while a lengthy period of new employment suggests borrowed employee status, "the converse is not true" where employment is cut short by an accident. *Brown*, 984 F.2d at 679 (quoting *Capps*, 784 F.2d at 618).  Because Butcher did not spend a substantial amount of time in his new employment, the seventh factor does not shed light on the nature of Butcher's relationship with Marlin and Superior.

### 8. Right To Terminate

The eighth factor asks whether the alleged borrowing employer has the right to terminate its relationship with the worker.  In this case, there is no evidence that Marlin had a

---

[49]   (R. Doc. 24-5 at 26.)

right to terminate Butcher.  It is true that Marlin reserved the right to require CW's subcontractors' employees to submit to drug tests in compliance with Marlins's Contraband Control Policy,[50] but the MSA does not provide Marlin a right to terminate an individual employees who fails a drug test.  Instead, the MSA provides only that "failure of your employees to comply and cooperate with this policy may cause cancellation of your contract with Marlin Energy."[51]  Because there is no evidence that Marlin had a right to terminate the relationship with Butcher, this factor weighs against borrowed employee status.

    9.   Obligation To Pay

    Finally, the ninth factor, who had the obligation to pay the employee, weighs against borrowed employee status.  Triumph has not produced any evidence that Marlin was responsible for Butcher's wages.

    Triumph has failed to provide evidence that Marlin controlled Butcher's work activity, and Butcher's deposition and the terms of the MSA suggest otherwise.  Four additional factors weigh against borrowed employee status, three weigh in favor, and one is neutral.  The five factors weighing against borrowed

---

[50]    (R. Doc. 153-3 at 20.)

[51]    (*Id.*)

21

employee status, including the central factor of control, are sufficient to establish that Butcher is not a borrowed employee of Marlin as a matter of law.  *See Jackson v. Total E&P USA, Inc.*, 341 F. App'x. 85, 87 (5th Cir. 2009) (finding borrowed employee status where five factors, including the control factor, weighed in favor of borrowed employment, and four factors were neutral).  Accordingly, the Court finds that Triumph has not created a genuine issue of material fact as to whether Butcher was not a borrowed employee and thus Marlin is entitled to summary judgment on Triumph's indemnification claim under that theory.

**C.    Insurance Obligations**

As an extension of the argument that Marlin is obligated to indemnify Triumph for Butcher's alleged injuries, Triumph contends that Marlin was obligated to name Triumph as an additional assured and to waive subrogation.[52]  The MCA specifies that Marlin's insurance obligations "shall only apply with respect to the Indemnities, obligations, and risks assumed by Charterer in this Agreement."[53]  Because the Court finds that no such indemnity obligation exists, the Court also finds that Marlin was not required to name Triumph as an additional inured.

---

[52]    (R. Doc. 133 at 11.)

[53]    (R. Doc. 127-2 at 6.)

22

**IV.   CONCLUSION**

For the foregoing reasons, Marlin's motion for summary judgment is GRANTED.


New Orleans, Louisiana, this <u>1st</u> day of October, 2010.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE